FEDERAL COAL AND COKE COMPANY *vs.* JAMES B. CORYELL, trustee in bankruptcy.

JAMES B. CORYELL, trustee in bankruptcy, *vs.* FEDERAL COAL AND COKE COMPANY.

Middlesex.    November 18, 1915. — March 10, 1916.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & CARROLL, JJ.

*Contract,* Construction, Validity. *Fraud. Practice, Civil,* Exceptions, New trial. *Evidence,* Self-serving statements.

A contract to furnish twenty-four thousand tons of furnace coke contained the following provision as to quality: "Quality. The Seller agrees to furnish the Buyer with 48 hour furnace coke made at their ovens located at Grant Town, West

Virginia, and in case the consignee finds at any time during the life of this contract that a fair average quality of the coke materially deteriorates from the quality of the coke shipped during the first one or two months of this contract, then the Buyer has the privilege to cancel any unshipped portion of this contract." A previous draft of the contract had contained a provision that "should the [consignees of the coke] at any time during the life of the contract find the coke is unfit for their blast furnace, then we have the option of cancelling any unshipped portion of the contract." The seller refused to sign the contract with this provision in it, and wrote, "I would be willing to insert in the contract a paragraph to the effect that the average quality of the coke, shipped during the first two months, be taken as a fair average sample of the coke, and subsequently should the coke be of inferior quality from said average sample, then [the consignees] would have the right to cancel same." Thereupon the contract was executed containing the paragraph as to quality quoted above. *Held,* that there was no warranty in the contract as to the quality of the coke to be delivered during the first one or two months under the contract.

In the same case it was contended by the buyer that a representation made by an officer of the seller and relied on by the buyer, to the effect that the coke would not be over 1.25 per cent in sulphur, when it turned out not to be true, justified the buyer in refusing to purchase any further coke under the contract, but it appeared that when the representation was made the seller's coke ovens were not in operation, that they were about to be started under a new management and that certain alleged analyses shown to the buyer were genuine. *Held,* that the representation was promissory in its nature and stated a reasonable expectation of the seller, and that accordingly its falsity did not entitle the buyer to avoid the contract on the ground of fraud.

An exception to the admission of certain evidence here was overruled on the ground that, even if it was incompetent, which did not appear, the substance of it already had been admitted in the examination of a previous witness, so that its introduction could not have harmed the excepting party.

Unanswered letters containing self-serving statements concerning a certain contract, written long after the date of the contract, are not admissible in evidence in behalf of the writer.

Where an action for breach of a certain contract in writing and a cross action by the defendant in the first action against the plaintiff in that action alleging a breach of the same contract were tried together, and under the rulings of the presiding judge a verdict was returned for the defendant in the first action, and the judge in the cross action ordered a verdict for the plaintiff in that action, who was the defendant in the first, and where exceptions of the plaintiff in the first action to the rulings of the judge in that action were sustained by this court, but for some unexplained reason no exception appeared to have been taken to the ordering of the verdict in the cross action, it was *held,* that, inasmuch as it appeared, in spite of this defect in procedure, that the same error was made by the judge in both actions in regard to the same issues which were tried together as one case, a new trial must be ordered in both actions.

CONTRACT, by the Federal Coal and Coke Company, a corporation, against (by substitution by amendment after bankruptcy) the trustee in bankruptcy of the firm of J. K. Dimmick and Company, who did business in Philadelphia in the State of Pennsyl-

vania, for the alleged breach of a contract in writing dated September 14, 1909, in refusing to receive and pay for any further deliveries of coke after the delivery of five hundred and forty-four tons. Writ, served by trustee process on the Malden and Melrose Gas Light Company as trustee, dated November 14, 1910; also a

CROSS ACTION by the defendant in the first action against the plaintiff in that action for an alleged breach of the same contract in failing to furnish coke of the quality called for by the contract. Writ dated January 31, 1913.

In the Superior Court the cases were tried together before *Hardy*, J. The contract sued upon, of which the fifth paragraph is quoted in the opinion, was as follows:

"Contract for West Virginia Furnace Coke.

"Agreement made this fourteenth day of September, 1909, between J. K. Dimmick and H. W. Coleman, trading as J. K. Dimmick & Company, Philadelphia, Pennsylvania, party of the first part hereinafter called the Buyer, and the Federal Coal & Coke Company, Boston, Massachusetts, party of the second part, hereinafter called the Seller.

"In consideration of the mutuality hereof, it is hereby agreed between the parties hereto as follows, viz:

"First: Quantity. The Seller hereby sells and agrees to deliver to the Buyer, and the Buyer hereby $\genfrac{}{}{0pt}{}{purchases}{sells}$ and agrees to receive approximately twenty four thousand (24,000) net tons of 2000 pounds each, of 48 hour Federal West Virginia Furnace Coke, for shipment during the year nineteen hundred and ten, as hereinafter set forth.

"Second: Price. The buyer agrees to pay for all coke shipped under this agreement at the net price of One Dollar and ninety Cents ($1.90) per net ton of 2000 pounds f.o.b. cars ovens, on the twentieth day of each month for all coke shipped during the preceding month.

"Third: Shipments. Shipments are to be made in about equal monthly proportions of two thousand (2000) tons each, beginning January first, 1910, and continuing until December 31st, 1910.

"Fourth: Shipments of coke under this agreement are subject to fires, strikes, accidents, car supply, and any other causes beyond the control of either Buyer or Seller, applicable to either

party. It is understood and agreed if there should be a shortage of coke cars, shipments under this contract will be divided from time to time in fair proportion on all orders, whether under this or coke contracts with other parties. It is also understood and agreed that in case the blast furnaces of the consignees are out of blast entirely or partially, shipments of coke under this contract are to be made in proportion to the operation of the furnaces of the consignee, and at the expiration of this contract should there be any unshipped portion due to the above mentioned causes, same is to be cancelled.

"Fifth: Quality. The Seller agrees to furnish the Buyer with 48 hour furnace coke made at their ovens located at Grant Town, West Virginia, and in case the consignee finds at any time during the life of this contract that a fair average quality of the coke materially deteriorates from the quality of the coke shipped during the first one or two months of this contract, then the Buyer has the privilege to cancel any unshipped portion of this contract.

"Sixth: Consignee. The coke covered by this contract is to be shipped to the Wellston Steel & Iron Company, Wellston, Ohio, and the Buyer cannot change the destination of this coke without the consent of the Seller, and the Buyer is only obligated to receive such portion of this contract as will be received by the Wellston Steel & Iron Company under the exceptions as noted in Clauses Fourth and Fifth.

"Seventh: The provisions of this agreement shall extend to the heirs, executors, administrators, successors and assigns of the respective parties hereto.

"In witness whereof the parties hereto have duly executed these presents the day and year first above written.

Witness: M. R. Gano.    J. K. Dimmick & Company
By H. W. Coleman

Witness: R. Grant    Federal Coal & Coke Company
to E. Page.    By Edward Page
Vice President."

The evidence is described in the opinion. At the close of the evidence the Federal Coal and Coke Company asked the judge to make certain rulings, of which those now material, because they were the only ones argued, were as follows:

"3. There is no evidence in the case that plaintiff made any false and fraudulent representation of an existing fact concerning the quality of its coke."

"8. There is no evidence in the case that the defendants relied on any representation of an existing fact concerning the quality of the coke at the time the contract was made."

The judge refused to make either of these rulings. In regard to the construction of the fifth paragraph of the contract he instructed the jury as follows:

"Now, in dealing with the fifth section of the contract it is my duty to construe that contract in the light of the claim that is made here by the plaintiff. It is claimed that in case the consignee finds at any time during the life of this contract that a fair average quality of the coke deteriorates from the quality of coke shipped during the first one or two months of this contract, then the buyer has the privilege of cancelling any unshipped portion of this contract. It is claimed here, as I understand, by counsel in argument on behalf of the plaintiff, that there was a duty imposed by this contract upon the defendant, or upon the Wellston Company, to use this coke or to test this coke through the period of one month or more. I do not so construe the contract. The duty is imposed upon me to construe the contract, and you have to take the construction from me. The language as used here is, that if they find at any time during the life of the contract, and so forth. Well, the word 'during' I construe to mean this: In the course of the contract, not throughout the whole time of the contract, and that is the apparent meaning of the term and that is the way I shall construe it and tell you. It says that if it is found at any time in the course of the life of the contract that a fair average quality of the coke deteriorates from the quality of coke found during the first one or two months, then the buyer may cancel the contract. Now, I construe the other language there, 'During the first one or two months,' to mean in the course of the one or two months. Now, I instruct you as a matter of law, in the construction of this contract, that the Wellston Company were not obliged to take coke during the whole month. If they found, in the course of the contract, that the average quality of coke did not come up to a certain standard or found it deteriorated, then they would be at liberty to cancel this contract.

"And I construe the words 'the average quality,' not to mean during the average of the whole month, but it means the average quality of the cars or selection from the cars, and if the Wellston Company, through its chemist, went to those cars and selected samples from several cars and combined those samples together and tested them and made an analysis, and they found there was a deterioration at any time during the life of the contract or in the course of the contract, then they would have the right to repudiate the contract.

"Now, I suppose some of you may have had some experience in building contracts, and I suppose in those building contracts you have seen the stipulation that the work must be done to the satisfaction of the architect who has perhaps supervision of the work. I suppose you understand those contracts, those of you who are acquainted with the real estate business. Now, in dealing with this contract, you have the right to consider that to the Wellston Company, to a certain extent, was confided the duty of acting as what you might call an arbiter, that they had the right to investigate the nature of this coke, that its quality was of some consideration in this case, and that if, after their investigation, after they tried it, it did not come up to what was proper by reason of the analysis, then they would have the right to cancel the contract for the future coke to be delivered. What are the facts here as testified to by the chemist? He says that the first sample taken from several cars he has tested or analyzed disclosed that the sulphur stood at 1.38 [1.35] per cent. This was out of the first shipment of coke. He says that the next analysis made with the other shipments on which tests were made, one disclosed 1.65, as I remember the figures, and the other 1.68. Now, if you find upon the facts here that there was this analysis made, that there was a deterioration in the shipments, you would be at liberty to find that there was the right on the part of the Wellston Company to cancel the contract."

In the first action, brought by the Federal Coal and Coke Company, the jury returned a verdict for the defendant, and thereupon the judge ordered in the cross action a verdict for the plaintiff in that action, the trustee in bankruptcy of J. K. Dimmick and Company, in the sum of $1,291.19. The Federal Coal and Coke Company alleged exceptions to the refusal of the judge to make

the rulings requested by it, to his instructions to the jury in regard to the construction of the fifth paragraph of the contract and to certain rulings relating to evidence which are described sufficiently in the opinion.

*F. D. Putnam,* (*J. A. Locke* with him,) for the Federal Coal and Coke Company.

*C. F. Lovejoy,* for the trustee in bankruptcy.

DE COURCY, J.  1. The fifth paragraph of the contract between the Federal Coal and Coke Company (herein called the plaintiff), and J. K. Dimmick and Company (herein called the defendants), reads as follows:

"Fifth: Quality.  The Seller agrees to furnish the Buyer with 48 hour furnace coke made at their ovens located at Grant Town, West Virginia, and in case the consignee finds at any time during the life of this contract that a fair average quality of the coke materially deteriorates from the quality of the coke shipped during the first one or two months of this contract, then the Buyer has the privilege to cancel any unshipped portion of this contract." The shipments were to be made in about equal monthly proportions of two thousand tons each, beginning January 1, 1910, and continuing until December 31, 1910; and the consignee was the Wellston Steel and Iron Company, to whom the Buyer (J. K. Dimmick and Company) resold the coke, under a written agreement.  The contract in question was prepared by the defendants. In the first draft was inserted a provision that "should the Wellston Steel & Iron Co. at any time during the life of the contract find the coke is unfit for their blast furnace, then we have the option of cancelling any unshipped portion of the contract." This the plaintiff's representative refused to sign; and wrote "I would be willing to insert in the contract a paragraph to the effect that the average quality of the coke, shipped during the first two months, be taken as a fair average sample of the coke, and subsequently should the coke be of inferior quality from said average sample, then the Wellston Steel and Iron Co. would have the right to cancel same."  And the defendants thereupon drafted the present contract.

We are of opinion that the true construction of paragraph Fifth is, that an average was to be taken of the coke shipped during the first month or two, and that such average would establish the stand-

ard up to which all subsequent shipments must measure. When early in January the Wellston Company found that samples of the coke sent to it analyzed 1.35, 1.65 and 1.68 sulphur, it stopped the shipments, acting presumably under the provision in its contract with J. K. Dimmick and Company, that "in case the Buyer finds this coke unfit for blast furnace use, then the buyer has the option on due notice to the Seller to cancel any unshipped portion of this contract." There was no such provision however in the contract between this plaintiff and defendant. It follows that the exception to the trial judge's construction of the contract must be sustained.

There was conflicting testimony as to the trade meaning of "48 hour furnace coke" as used in paragraph Fifth, some of the witnesses stating that it must be a coke that does not exceed 1.25 per cent in sulphur for blast furnace use, while others testified that it carried no guarantee of sulphur content. So far as the record shows this issue was not submitted to the jury. Putting this aside, we find no warranty in the contract as to the quality of the coke to be delivered during the first one or two months under the contract. Such omission may be due to the fact that the defendants had expected the plaintiff to sign a contract similar to that which they had with the Wellston Company containing a cancellation clause. Failing to obtain this Gano, who represented the defendants in the negotiations, apparently was content to rely upon the oral statements of Page, representing the plaintiff, as to the quality of coke it expected to ship.

2. The alleged misrepresentations of the plaintiff's vice-president, Page, relied on by the defendants, to the effect that the coke would not be over 1.25 per cent in sulphur, were promissory in nature and insufficient to entitle them to avoid the contract on the ground of fraud. As Gano knew, the plaintiff's coke ovens were not operating at the time, and were about to start under a new management. *American Soda Fountain Co.* v. *Spring Water Carbonating Co.* 207 Mass. 488. And as to the alleged analyses shown by Page, of coke made from the federal coal at the by-product ovens in Everett, there was no evidence that these were false. On the evidence the plaintiff was entitled to have its third request given in substance.

3. The other exceptions are of lesser importance and may be

disposed of briefly. There was no error in refusing to give the plaintiff's eighth request, in view of the memorandum of analyses in Page's book, shown to Gano. The other requests have not been argued, but we find no error in the refusal to give them.

As to the exceptions to evidence: It is difficult to see how copies of the docket entries and declaration or "statement" in the Pennsylvania suit tended to show a lack of good faith in maintaining the present action. However, as the evidence in substance had already appeared without objection in the examination of the witness Page, the plaintiff does not appear to have been harmed. The unanswered letters of the defendants, dated December 13, 1909, and January 21, 1910 (exhibits 4 and 7), both written long after the date of the contract, were self-serving statements and inadmissible. *Maloney* v. *Philpot,* 219 Mass. 480.

The record shows that in the cross action a verdict was rendered by order of court for the plaintiff, James B. Coryell, trustee in bankruptcy of J. K. Dimmick and Company, and for some unexplained reason no exception appears to have been taken thereto. As there was error in the main action with reference both to the issue of breach of contract and that of false representations and the defendant's cross action was for breach of the same contract, and the two were tried together as one case, a new trial should be granted as to both.

*Exceptions sustained.*